# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

| | |
|---|---|
| Timothy L. Hoeller, ) | CIVIL ACTION |
| Plaintiff and DQR Services, Professional ) | & |
| Services, class action on behalf of similar ) | CERTIFY A CLASS ACTION |
| situated employee members ) | |
| and ) | |
| Supplier Quality & Failure Analysis Center, ) | |
| a qui tam action on behalf of the federal gov't ) | **21-C-1033** |
| ) | |
| v. ) | No. _____ |
| ) | |
| ) | |
| Carroll University, Inc., a higher learning ) | |
| Institution defined under federal laws and federal ) | |
| government contractor, Defendant ) | |

2021 SEP -3 P 3:55

CLERK OF COURT

U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

## COMPLAINT – SUMMARY

This cause has two separate and distinct but not severable areas of negligence under the theory of a <u>breach of fiduciary duties</u>. One area considers improprieties to insurance providers. The other is inappropriate wages to part-time faculty members. When adjunct faculty members work at a teaching institution, time and activity is not necessarily reported to insurance carriers to calculate personal injury liability insurance and Worker's Compensation since many part-time employees are not covered by benefits. When they work outside the contracted dates, those activities can be hid in financial records adversely affecting the insurance industry for a breach of fiduciary duties in which the Supplier Quality & Failure Analysis Center$^{TM}$ is making this action on behalf of the King as a *qui tam* action of false, misleading information, or intentional omissions that sucks federal benefits paying less for insurance premiums and more on claims, including expensive and costly litigation for failure to have adequate policies and carry out faithfully the practices

associated with those policies. Non-exclusion, diversity, equity and inclusion are a must in hiring with limitations in diversity allowed based on local markets. Having insurance is not meant as the only sense of security. Purchasing insurance is also not the only way out of every problem. The university must stay vigilant, pro-active, and remain mitigation-of-potential damages minded in all activities where good communications with insurance providers is indispensable. This lawsuit questions these practices at Defendant Carroll University ("Carroll") and seeks injunctive relief as well as class action certification.

PART I: INSURANCE ACTIONS OF A QUI TAM FALSE CLAIMS CAUSE

    A.     UNDERPAYMENT OF INSURANCE PREMIUMS

    B.     FAILURE TO CONSIDER, REQUISITION, AND MAINTAIN REQUIRED INSURANCE

    C.     FAILURE TO MITIGATE POTENTIAL DAMAGE IN INSURANCE CLAIMS FOR PERSONAL INJURIES AND ERRORS AND OMISSIONS

Specifics of these causes of action will be addressed next in the sections on Complaint – Specifics. In general, those itemized claims below in violation of reasonable employee payment expectations and in some cases violations of statutory regulations to employees also affect the insurance industry for lost revenue, too. Hoeller's self-employment interest in this matter is DQR Services for recovery of professional services, printing, and mailing costs:

PART II: EMPLOYMENT ACTIONS UNDER FLSA AND APPLICABLE STATE CAUSES

    A.     UNDERPAYMENT OF WAGES AS A FAIR LABOR STANDARDS ACT ACTION AND APPLICABLE WISCONSIN STATUTES AS APPLIED TO EXEMPT PROFESSIONAL'S EMPLOYMENT

    B.     UNFAIR LABOR PRACTICES WITHOUT COMPENSATION TO THOSE TEACHERS DEFINED IN SECTION 551.301 WHO ARE UNKNOWINGLY UNAWARE THAT TERMS AND PRIVILEGES OF EMPLOYMENT CAN BE CHANGED AT WILL DURING A SEMESTER AFTER CONTRACT PERFECTION FOR THAT SEMESTER

## BACKGROUND

This litigation is filed pursuant to diversity jurisdiction in which Class Members of part-time faculty under employment contracts have a minimum of $110,000 in losses if findings of this lawsuit concur that only one day of unpaid wages for attendance outside contracted dates at an informational / training session is owed by the Defendant Carroll University ("Carroll") to class members each semester covering the last six (6) years. The amount of pay recoverable for past, unpaid work in this situation would be $1/15^{th}$ to $1/16^{th}$ more than the typical salary that adjunct received for the classes taught in that semester if the training session before the semester counted for an additional week of paid salary. All class members are exempt employees with characteristics of both professional employees and teachers. The teaching duties are the front-facing activities with students of train, form, and educate and the professional duties are all other activities behind-the scenes to facilitate automated processes, documentation, and records management. Defects like the lawsuit of student *Carlson v. Carroll, Case No. 09-C-551, Dist. Court, ED Wisconsin 2011* cannot be allowed to occur. Forming a student in an accomodation cannot be that stressful that puts that student into intentional legal action against the institution.

In addition to one week of unpaid work, if Class Members are found to have not been paid for activities in a breach of fiduciary duties theory that other institutions provide in separate compensation, for which those organizations have an Adjunct Faculty Association Collective Bargaining Agreement (refer to Oakton Community College, Chicago, Illinois in *Filipek v. Oakton Community College, Dist. Court, ND Illinois 2018),* then Carroll could pay like *Oakton Community College* additional income for the following: (1) tutoring assignments, (2) substitute teaching, and (3) attending meetings.

- 3 -

In regards to attending meetings that were unpaid and not required to attend when the Plaintiff was employed at Carroll during the Spring 2017 term, Carroll had monthly all-employee meetings and monthly faculty meetings. Hoeller only attended one faculty meeting. It was reported at that meeting that adjuncts were not included and they did not need to come after the first one that set a new agenda for that semester. If it were not but-for-the-fact that Hoeller had come to these meetings, he would not have been able to protect his rights asserting negligence, breach of contract, and inappropriate, tortious conduct against the business entity of Carroll from his employment and failed continuation of that employment by employees and executives of Carroll.

In addition to the above meetings, Hoeller had at least one departmental meeting outside the contracted dates and one review meeting during the semester. He also attended several colloquia to further his general knowledge. Assuming that only two (2) departmental meetings and one all-employee meeting are required per month and compensated for attendance up to two (2) hours long each, then this would increase pay by about 10% for faculty having three contacts in class with students per week. If a one (1) hour long office hour that was required per week was compensated as a "tutoring assignment" with additional pay, then this would increase adjuncts pay weekly by $1/7^{th}$ for those with three contacts in class with students per week. Here a contact with students in a class is a two (2) hour long period.

Carroll paid Hoeller the absolute lowest pay that he had ever obtained in a flat-rate pay scheme going back to his teaching in the Chicago area prior to 2005 at private institutions and public ones that were not unlike *Oakton Community College*. A Wisconsin Class Action lawsuit against the Milwaukee Bucks for a flat-rate pay scheme has already

- 4 -

occurred in Milwaukee's federal courthouse in favor of the class, since the findings in that lawsuit showed that there are many more activities and non-billable time that was not properly compensated in a breach of fiduciary duties theory for non-independent contracted employee cheerleaders. This flat-rate of pay scheme is similar to faculty members at Carroll who have preparation time and administration time of a professional including grading and managing special requests of students that really take up the most extra time as that adjunct has to learn about the university's offices, processes, and procedures including using the school's learning and grading software to manage communications. Hoeller hired an employment lawyer in a paid consultation on May 2, 2017 to document a letter that was filed as one of the last documents in *Case No. 19 C 850, Hoeller v. Carroll University.* It was determined that there was not enough time based on the pay for a detailed oriented faculty to conform to all of Carroll's business processes once that faculty member like Hoeller had taught prior courses. An hourly rate less than acceptable for a professional employee under wage guidelines has occurred.

In sum, if all of the above were operative to have increased Hoeller's salary during the Spring 2017 term for the four (4) credit hours that he taught, then he would have had about 30% more pay which would have been respectable for Waukesha, Wisconsin compared to Chicago, Illinois where exempt salaries are about 6-8% higher for the same work when one compares offices by locations. This is the regional effect of the market that is expected by the U.S. Department of Labor.

What is not expected and would be appalling to a reasonable juror is that if Hoeller's contact time per week was six (6) hours with students and he had about 2.5 times more preparation time which is not unlike that which is required of a student for studies, then Hoeller was putting in 21 hours per week. Since 2 of the 6 hours per week was with a

lab course where others set-up the lab, the actual amount of time was 20 hours that include grading and documenting grades with final grade adjustments. At Carroll's pay rate, this came to an appalling amount of $11.60 per hour for professional employment in which $17.10 should be an amount today acceptable for those starting a new job with only an associate's degree. All adjunct faculty at Carroll have masters and doctorate degrees making those employee worth more and hard to find, so Carroll cannot be beggars or choosy in employing part-time faculty as the market around Waukesha is extremely small.

All universities have endowments which are donations from prominent alumni to assist students in attending in scholarship money. A new *Waukesha County Probate Case 21 PR 476* has been filed on July 16, 2021. Hoeller has already alleged that if Judge Domina is going to dismiss *Waukesha County Case N0. 19 CV 995, Hoeller v. Carroll* with prejudice for failure to take personal jurisdiction on what the opposing lawyer states in court for the parties, then Judge Domina has errored in not all excluding all types of jurisdiction. In the appeal of *Case No. 19 CV 995*, Hoeller has already noted that he only needs jurisdiction over "the thing" (i.e., *in rem* jurisdiction) of the bank accounts of Carroll to pay for this and other litigation underway in this federal courthouse.

The obituary of Richard "Dick" L. Oates in *Waukesha County Probate Case 21 PR 476* states that he retired as the President of Sunset Bank and Savings ("Sunset") which was liquidated into $9.6 million cash assets and merged into PS Holdings, Inc. per published announcement on December 16, 2020. Loans amount to $102 million. The probate case is represented in court by Bielski Chapman, Ltd, Chicago, Illinois which advertises full-services in Estate Planning. Information at Carroll listing their endowments, shows that Richard "Dick" L. Oates set-up one endowment Richard L. and Judith Mink Oates Scholarship Fund and another one called the Carolyn Hunter Oates Endowed

Scholarship Fund for International Study at Carroll University. The primary assests of his estate was from apparent joint ownership of ComCor Mortgage Servicing. Perhaps, his fees are 1-2% of the cost of each loan on the high end. On the low end, a bank can sell off the servicing for about $450. Hoeller is trying to learn about accounting this way be studying this unique situation. While all of the loans that ComCor Mortgage Servicing is decreasing as they are being paid-off, there should be some stream of income to Carroll University which is listed as an Interested Party in this lawsuit due to the existing Richard L. and Judith Mink Oates Scholarship Fund. The estate may want this lawsuit settled, and they have more clout over Carroll University than any one single employee. The estate is in a precarious situation in starting a new endowment, because of Hoeller declaring *in rem* jurisidiction in the Court of Appeals Case No. 20 AP 227 over Carroll's banks, which are really Carroll's cash assets. This precarious situation is further exacerbated because Carroll is a federal government contractor in which expenses for lawsuits like these are waste of government money. The full-service would have set-aside money in Estate Planning for extraordianary situations like this when a breach of fiduciary duties is alleged against a benefactor of their own efforts. Mixing of money form this cause and the Waukesha probate cause cannot occur. Hoeller can be a Garnishee of Ms. Catherine Jorgens wages, and indirectly a Garnishee to Carroll for the assests of this Probate Cause, all endowments, and other cash up to the $2.5 million asserted in damages. Compared to the federal cause in Milwaukee's federal courthouse of *Henige v. Board of Regents of the University of Wisconsin System, Case No. 20 C 6, United States District Court, E.D. Wisconsin (February 11, 2021)* with the same injuries occuring besides current and future employment, of privacy rights, lost reputation, and consent decrees to correct problems

like harassing work environments, the amount that Hoeller is seeking of $2.5 million is small compared to the $6 million of *Henige*. In any such litigation for which the Root Cause of failure is Carroll's failure to have a suitable process to protect from losses with auditors of the Higher Learning Commision that are unable to uncover defects, the Higher Learning Commission can be sued collatoral to this lawsuit by "The Company" which is the Supplier Quality & Failure Analysis Center for not congnitizing the greatest risk at Carroll for the Root Case of not having a student accomodation practice stemming from no effective policy going back to *Carlson v. Carroll, Case No. 09-C-551, Dist. Court, ED Wisconsin 2011*. The amount of this or any lawsuit can wipe out one entire endowemnt permamently, so alumni like Richard "Dick" L. Oates can pressure Carroll to shape-up or ship-out in setting those policies to manage internally their own problems in student, faculty, and staff discourse without personal harm of lost reputation. The beneficiaries may become intrevenors in this lawsuit suggesting a settlement.

Plaintiff Hoeller has services available of Ms. Mary Hoeller, JD., attorney of Indianapolis to monitor this Probate Cause. She is a Registered Mediator. The work of Trusts, Estates, Guardianships, and Probate are right up her current services of her law firm. She has told me that her fee is $2,000 upfront that does not include travel in order to work on mediation in such a cause as this. The alumni do not have give Carroll anymore money while this federal lawsuit of a breach of fiduciary duties is going on. Endowments that pay for a student's tuition is nice to have but they do not really meeting the real world problem that an institution would not exist if it were not for the people and faculty. In this cause, Carroll has such a high number of part-time faculty that they do not pay benefits that they could be considered involved in fraudulent scheme like the precedence of the 7th

Circuit Court of Appeals in *U.S. v. Leahy, 464 F. 3d 773 (7th Cir. 2006).* Unfortunately, such a scholarship does not do any good if the faculty are not treated well and taken care with suitable benefits and pay at Carroll. As well as Carroll's insurance providers who have a duty to propery protect the assets that Carroll has gained over the years as a federal government contractor. The costs of Carroll to maintain litigation as a process to develop policies is a cost of failure of poor quality when they fail to execute projects to learn of such areas as student retention, educational disability accomodations, and faculty tenureship and advancement without targeting someone to incite litigation.

Plaintiff Hoeller established the Non-Profit Photographic Institute Foundation, Inc to assist photographers with local, state, and federal initiatives and whose group has been severly hard-hurt due to COVID-19. Assuming that teachers can get out of the category described in federal laws as a teacher since some of the work is that of a professional dealing with the institution, then a minimum hourly rate of an employee must be higher than an exempt professional employee with an associate's degree starting their first job at $17.10 for base pay. Pay must cover all work for every activity whether it is for visible teaching duties and back-end grade processing.

## COMPLAINT – SPECIFICS (Part I - Insurance)

The specific issues under each of the general allegations presented above are as follows:

PART I: INSURANCE ACTIONS OF A QUI TAM FALSE CLAIMS CAUSE

A.      UNDERPAYMENT OF INSURANCE PREMIUMS:  This cause refers to part-time faculty members like Hoeller beginning work (on campus) prior to the dates of an employment contract when Personal Injury liability insurance and Worker's Compensation Insurance for meetings, informational seminars, and training may not be provided under a general liability plan that only covers specific dates when the campus property is open to usage.   This applies to all educational institutions whether or not they are of higher learning if covered only on select periods through the year.  The precedence for this is a Criminal cause of action, *U.S. v. Leahy, 464 F. 3d 773 (7th Cir. 2006),* where the convictions of all the defendants and the district court's evidentiary rulings were upheld and the district court's conclusion regarding the extent of Defendant *Leahy's* involvement with an insurance fraud scheme required re-calculation of the level of restitution required. Like *U.S. v. Leahy,* Carroll employed temporary employees who taught college classes in which temporary employees are not normally covered by any benefits.  In fact, Plaintiff Hoeller recalls nothing in his teaching, informational / training session held before the semester on January 19, 2017 when Hoeller taught four (4) credit hours on campus, or his Adjunct Faculty Handbook that would indicate any benefits. Like *U.S. v. Leahy* and assuming that Wisconsin's Workers Compensation system is similar to that of Illinois where three factors are required to determine premiums -- i.e., (1) correct classifications for the various jobs performed, (2) amount of payroll in that job classification, (3) exper-

- 10 -

ience modifier -- part-time faculty members being the most prevalent class type at Carroll with contact time on campus of a prime concern, then Carroll has cheated its insurance companies by not paying for about $1/15^{th}$ to $1/16^{th}$ of an additional premium each semester if those faculty members were in meetings up to one week long in duration prior to the semester in which the insurance carrier was led to believe that only people were on campus during the regular semesters and that would be the only period for general liability and personal injury insurance coverages. For Adjunct Faculty at Carroll, the Chief Financial Officer ("CFO") could present evidence of wage payments made during the semester hiding other activities, thereby enabling a scheme to defile their insurance providers of revenue.

There can be two (2) separate issues under I. UNDERPAYMENT OF INSURANCE PREMIUMS due to the possibility that like *U.S. v. Leahy*, the number of adjunct faculty that may not be covered by general liability and personal injury insurance coverage may be the largest amount of cumulative time for any teacher at Carroll. A second issue might be that the meetings held outside of the semester for information and training may require errors and omissions insurance. This is more appropriately covered under II. FAILURE TO CONSIDER, REQUISITION, AND MAINTAIN REQUIRED INSURANCE.

B.   FAILURE TO CONSIDER, REQUISITION, AND MAINTAIN REQUIRED INSURANCE

To be comprehensive in regards to this brief and not likely as a means of insurance fraud, it may be the case that due to so many campus changes that any or each of the following property maintenance that were observed to have occurred on Carroll's campus around mid- to late 2016 based on the President's "Opening Remarks" made on August 31,

- 11 -

2016 and are itemized below with an exhibit – that no staff member was reporting this to their insurance carriers which would be an abuse of Carroll's insurances. Hereinafter, "President" refers to Carroll's acting President that should not be confused with Sunset's President.

1. Exhibit "A" - A hall got upgraded windows that unless these were extremely special or costly, typically no requirements to notify Carroll's insurance provider is needed.

2. Exhibit "B" - A new science building was dedicated on September 30, 0217 in which there could hardly obtain occupancy without the insurance providers knowing about this, and it is likely that there was pre-occupancy insurance associated with interior construction.

3. Exhibit "C" – Renovations inside a gymnasium may change substantially the property's value so prompt insurance reporting is needed. Also, while those changes are going on, the area must be secured so that no one is hurt who does not need to be in that gymnasium.

4. Exhibit "D" – A demolition of a building in the summer of 2017 occurred which created an immediate hazard requiring that this portion of Carroll's property be secured from public access, and generally separate construction project insurance is required for the contractors working at the site. On Carroll's side, if they failed to check, audit, or cognize the need to examine their own insurance at the start of this construction project for a comprehensive general liability policy covering personal injury in case someone got into the site and hurt and for environmental problems that may result from contamination released during the demolition.

The fact that the campus had taken photographs for the President's "Opening Remarks" made on August 31, 2016 would probably indicate an insurance industry reason for doing so, so that Carroll was probably at all times in compliance with II. FAILURE TO CONSIDER, REQUISITION, AND MAINTAIN REQUIRED INSURANCE which could be failure to communicate on a more-or-less regular basis with its insurance providers.

C.    FAILURE TO MITIGATE POTENTIAL DAMAGE IN INSURANCE
      CLAIMS FOR PERSONAL INJURIES AND ERRORS AND OMISSIONS

A true and accurate copy of a paragraph of a letter released by the Supplier Quality & Failure Analysis Center to the Wisconsin Department of Justice, Paralegal Ms. Dawn M.

where Hoeller is a Whistleblower, was conceived is as follows:

1. <u>Insurance "Act of God" Re-imbursement Potential Fraud</u>: On or around the beginning of April 2017 when I was teaching Physics II Recitation in a corner classroom on the third and top floor of one of the buildings associated with Science Classes, there was inclement weather that was threatening enough that I asked during announcements at the beginning of class if any of my students knew of HOW the university would notify us if we had to evacuate the building to seek shelter. No student ever answered that question including when I pressed that some of them who lived on-campus should know this, because it could affect their residence halls. It actually did happen at a later time. There seemed to be no warning system nor mention in our Faculty Handbook about what to do in inclement weather. Later, as if I had a premonition of pending doom, the university was 'hit' was inclement weather and sustained straight-wind damage in the Summer of 2019. This damage was reported on the news. Later, the university would announce that it had re-built supposedly using insurance proceeds a new Education Division building. I do not know at about what amount of an insurance claim this can be examined for potential over-collection of insurance settlement monies.

In regards to I. UNDERPAYMENT OF INSURANCE PREMIUMS, the Supplier Quality & Failure Analysis Center that has hourly charge rates of $350 per hour, wrote the following in the same letter dated May 29, 2021 to the Wisconsin Department of Justice, Paralegal Ms. Dawn M. Clark:

2. <u>Intentional Lessing of Worker's Compensation Premiums</u>: The case that I am enclosing for examination of U.S. v. Leahy, William E. Stratton, James M. Duff, and Terrence Dolan, 464 F.3d 773, 7th Cir. (2006) describes a potential criminal charge that "through this extensive scheme to hide the true nature of Windy Labor's business", the criminally charged defendants paid approximately $1.09 million less in premiums that it should have paid. These were worker's compensation based on Illinois's formulation. Although I do not know much about HOW Wisconsin does this, I presuppose the systems are not much too much different that a claim can be made that Carroll's temporary workers under contract were not fully covered for all events and activities associated with that contract. Now, when I was in a department meeting on or around January 19, 2017 that was arranged by Instructional Faculty member, Mr. Gregory Gabrielson, another Adjunct Faculty member came into the meeting momentarily who was going to teach Physics Lab II so that I did not have to come to campus on those days. He asserted that unless his contract for the dates of the contract was not changed, he would not possibly not work. So, it looked like in his contract that the school was attempting to take away one week of work for every 16 week-long class. In my contract I did not think it important at the time, but I attended an Adjunct Faculty Training Session immediately after this meeting and it fell outside our scheduled contracted dates. Thus, we were all attending this Adjunct Faculty training session without possible compensation under our Worker's Compensation Plan. We also were never informed if Carroll's insurance provider would cover us, and if so, the dates of coverage.

**COMPLAINT – SPECIFICS (Part II - Employment)**

PART II: EMPLOYMENT ACTIONS UNDER FLSA AND APPLICABLE STATE
CAUSES

A.    UNDERPAYMENT OF WAGES AS A FAIR LABOR STANDARDS
      ACT ACTION AND APPLICABLE WISCONSIN STATUTES AS
      APPLIED TO EXEMPT PROFESSIONAL'S EMPLOYMENT


This cause refers to part-time faculty members like Hoeller beginning work prior to

the dates of an employment contract covering a specific school term for professional

services, teaching work, or working overtime after the contract ends and without weekly

minimum payments of a salary required during those periods under statutory law. In fact,

the salary would be $0 and represent a clear violation of the FLSA for each week that this

happened covering many employees, perhaps up to 300 per semester at Carroll University.

An example of this is already known to a federal district courthouse in *Hernandez v.

William Rainey Harper College, Dist. Court, ND Illinois 2011* in which background

information of that case states: "Hernandez began scouting and recruiting players during

the summer of 2007, but he was not working under an employment contract at that point."

Note that Hernandez was an Adjunct Faculty member who was employed to work at

Harper College under a contract as a head coach. His work to scout and recruit players was

a part of his duties that he has not been compensated for, because it supposedly occurred

before payments under that contract of weekly salaried amounts. It was notable to another

federal district that they placed this into a factual section.

B.    UNFAIR LABOR PRACTICES WITHOUT COMPENSATION TO THOSE
TEACHERS DEFINED IN SECTION 551.301 WHO ARE UNKNOWINGLY
UNAWARE THAT TERMS AND PRIVILEGES OF EMPLOYMENT CAN BE
CHANGED AT WILL DURING A SEMESTER AFTER CONTRACT
PERFECTION FOR THAT SEMESTER

It has already been stated in the Background Section, P. 3 that "if it were not but-for-the-fact that Hoeller had come to these meetings, he would not have been able to protect his rights asserting negligence, breach of contract, and inappropriate, tortious conduct against the business entity of Carroll from his employment and failed continuation of that employment by employees and executives of Carroll. At one of the meetings, Hoeller had apparently learned about the beginning of the semester President's "Opening Remarks" presentation that can be downloaded. Apparently, on Febraury 27, 2017 while teaching at Carroll University, the Plaintiff Hoeller downloaded these presentations for the Fall 2016 term and the Spring 2017 term. This has been indispensable, because in the filing of litigation in Waukesha County Case No. 21 SC 1653 against Ms. Catherine Jorgens, JD, it is apparent that Carroll had not policy associated with an Ethos of Respect statement. As recently filed in Milwaukee's federal courthouse Case No. 19 C 850, those presentations show proposed projects and not completed work which Ms. Jorgens is purporting to have occurred to the Wisconsin Equal Rights Division in its March 23, 2021 determination. So, it is an unfair dealing of Carroll that those employees who did not attend any meetings, would not have known of all relevant information to protect their employment rights. In addition, Carroll sent out a newsletter blast to students, faculty, and staff in which it took Hoeller over four (4) hours the first week to read all of the entries. The number of entries was the highest that Hoeller ever had with any institution where he taught. It is possible that Carroll could change policies and procedures relative to contracted employees work in

one of the email blasts that it would not be caught by the employees. In fact, this did happen because the collection of a student course evaluation that was announced as New Business at a faculty meeting in February 2017 became a breach of contract cause of action for contracts previously signed in which an Adjunct Handbook, contracts, and an initial informational-training meeting was the whole of the contract. No one at the rate of pay of $11.60 or even a professionals at $17.10 is going to put up with non-billable time examining changes during that contract period. In fact, if they had to re-examine their contract during the semester, then the institution would have to pay then at the rate of a lawyer which might be $300 per hour. A person in a jury would understand that this both unequitable and unfair to make New Business during a contract period of a semester and then apply that all contracts.

## I. Plaintiff's Status of State and Federal Litigation against Carroll

Other litigation between Hoeller and Carroll University has been dismissed with prejudice in *Waukesha Case No. 18 CV 995, Hoeller v. Carroll* for allegedly Hoeller filing of a charge past 300 days allowed administratively according to Judge Domina on January 2, 2020; failure to take personal jurisdiction over Carroll from a ruling made to dismiss *Case No. 18 CV 995* shortly after it was opened on June 4, 2019 without objections of Hoeller; and failure of Hoeller to complete jurisdiction over Carroll University and its employees within 90 days under Wisconsin Statutes to commence litigation. Despite all of this, Hoeller has not failed to act in this matter as he has been able to charge both the State of Wisconsin - Equal Rights Division ("ERD") in Milwaukee's *Case No. 21 SC 1518* and indirectly Carroll University as a business entity through *Waukesha County Small Claims Case No. 21 SC 1653, Hoeller and DQR Services v. Jorgens* for *laches* denying Hoeller timeliness in replies of statutory laws governing injuries to persons of three (3) years.

Hoeller has appealed *Waukesha Case No. 18 CV 995* by filing of a brief that the Defendant Carroll wanted stricken in *Wisconsin Appeal's Case No. 20 AP 227* due to insufficiencies of mistakes in the brief's format. In addition, he has commenced litigation that has been dismissed without prejudice against Ms. Catherine Jorgens in *Waukesha County Small Claims Case No. 21 SC 1653* where she is acting as an agent of Carroll University in regards to answering charges of discrimination based on disability and retaliation after Hoeller had filed an internal charge of harassment dated January 25, 2018. Hoeller had never signed that charge of discrimination.

It is hardly believable what the Defendant's have written in regards to Carroll's arguments in defense of those charges. What is believable and the Wisconsin Equal Rights

Division has not written anything about this is that Carroll has no process like prior federal lawsuit *Cheryle Carlson v. Carroll University f/k/na Carroll College, Eastern District, Wisconsin, Case No. 09 C 551* that would address peer-to-peer harassment.

Hoeller had serious concerns when he taught at Carroll during the Spring term of 2017 about safety and personal security as he hardly has reached in his career stability of social needs for which he has weakness in this area. In his posiiton in the Spring 2017 term, for which the same would apply in a similar contractual employment relationship for the Spring 2018 -- that his compensation was paid from the first day of class until the last day of class with the final pay period of May 31, 2017 covering the time-period of the reporting of grades and makeups, if needed. In this case, the peer-to-peer harassment was Carroll's Public Safety Director calling Hoeller one day after he [Hoeller] had spoken with the Provost's secretary on or before Janaury 25, 2018 to announce outside his job duties that he was not working at Carroll, and if Hoeller were to come onto campus property that he would exercise his rights to seek City of Waukesha Police intervention for supposedly harassment in Hoeller's conduct to staff members and not students going back his teaching in the Spring 2017 term. It was this conversation that got Hoeller livid as it was not believable that the tendering of his application through Ms. Catherine Jorgen's legal office at Caroll would end in such a result of deciet. All of this made Hoeller request the Public Safety Director to send Hoeller a letter and Hoeller sent a similar letter to the Provost's Office making an internal charge of harassment premised on civil rights violations. What the civil rights violations were actually are premised on a denial of constitutional rights that have been afforded other faculty under *Gouge v. Joint School District No. 1, 310 F. Supp. 984 - Dist. Court, WD Wisconsin 1970.* Hoeller knew of this case prior to seeking

- 18 -

continuation of his annual renewal contract in the Spring 2018 term.

Milwaukee's federal court in *Case No. 19 C 850* has dismissed all causes including
<u>Failure to Re-hire</u> on pretenses that Hoeller had not met statutory requirements of the 300
days, but that was not true because he is suing the defendants for *laches* when the charging
documents were accepted by the EEOC on September 17, 2018 and the mail did ont get to
Hoeller at no fauilt to him  September was an extremely business month for Hoeller as he
had to re-setup his home after being held in custody. Hoeller did his best to update
Waukesha County's Circuit Clerk of Court with his address that needed correcting. He did
his best to timely bring action against the Circuit Clerk of Waukesha Court for interfering
with his personal appearances premised on Carroll's injury to Hoeller of mental health
stress case that has been noticed in Waukesha County courthouse to Ms. Jorgens, General
Counsel in *Case No. 21 SC 1653.*

Hoeller has become the <u>Prevailing Party</u> in state court in a briefing schedule to seal
the entire file of *Civil TRO-Case No. 18 CV 376.*  He has not been compensated for his
time and costs in regards to that court process. Money is necessary to continue the
prosecution of this cause. The <u>Prevailing Party</u> in employment law can be found described
in *Hoeller v. Eaton Corp., 149 F. 3d 621 (7th Cir 1998).*

A good description of how facts are to be reviewed and judged by federal court in
regards to a charge of retaliation associated with employment law is  *Lugg v. Sutton, Dist.
Court, CD Illinois 2021.*

> Lugg's first argument to show causation, as articulated on pages 85-88 of her
> Response and repeated throughout her response to proposed material facts
> section,[53] is that Lugg has "rare evidence of timing proximal and suspicious
> enough to show causation." Doc. 35, at 85. While a few hours or days can
> certainly constitute temporal proximity, depending on the circumstances, the
> Court disagrees that Lugg has this "rare" evidence.

The Court recognizes the well-establish precedent quoted by Lugg that suspicious timing can establish an inference of retaliation "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." _Lord v. High Voltage Software, Inc.,_ 839 F.3d 556, 564 (7th Cir. 2016) (quoting _Culver v. Gorman & Co.,_ 416 F.3d 540, 546 (7th Cir. 2005)). However, close temporal proximity alone is rarely sufficient to show causation in a retaliation claim. _Coleman v. Donahoe,_ 667 F.3d 835, 860-61 (7th Cir. 2012); _see also McCann v. Badger Mining Corp.,_ 965 F.3d 578, 592 (7th Cir. 2020) (rejecting plaintiff's argument that suspicious timing alone was enough to survive summary judgment). Illinois courts agree. _See Flick v. S. Illinois Healthcare,_ 21 N.E.3d 82, 88 (Ill. App. Ct. 2014) ("[C]lose timing is usually not enough to establish a causal connection standing alone"). But proximity alongside other corroborating evidence may support an inference of retaliatory motive and permit a plaintiff to survive summary judgment. _Coleman,_ 667 F.3d at 860-61. Where an inference of causation would be reasonable in a particular case, "[a] jury, not a judge, should decide whether the inference is appropriate." _Loudermilk v. Best Pallet Co., LLC,_ 636 F.3d 312, 315 (7th Cir. 2011). However, a submission to the jury on this issue depends on the unique facts of the case — it is not automatic. _McCann,_ 965 F.3d at 593 n.72.

Because of the timing of Hoeller's applications in the Spring 2018 term to Ms. Jorgens letter dated February 20, 2018 denying any continuation of employment; causation of online information from _Hoeller v. Eaton Corp., 149 F. 3d 621 (7th Cir 1998)_ to perceptions about Hoeller and anyone with similarities to Hoeller in communications skills; a request of his to the secretary of the Provost's office to review his applicatoins in the absence of a reply of the hiring staff which was Dr. Kevin McMahon, Departmental Chair; with Hoeller becoming testy raising his voice with denials of the secretary of the Provost's office to speak to the Provost after leaving a message requesting the same around February 18, 2018; Jorgens letter allowing Hoeller the priviledge of applying without having to go through a different process than other, similary situated part-time faculty members using the standard annual contract renewal process (i.e. the "Standard Process") as described my Ms. Jorgens; and Jorgens making intentionally inflamatory statements to the City of Waukesha Police that has been published in news reports that "Hoeller was in constant contact with her [Jorgens]" that was presumably harassing – that all of this in total would indicate that anything Ms. Jorgens states in regards to Carroll's <u>Position Statement</u>

- 20 -

with the Wisconsin Equal Rights Division cannot be trusted as there is an indication of inappropriate conduct of hers.

Ms. Jorgens was involved in his applications as she wrote a letter in early January 2018 that "Hoeller had to apply using the standard process". Thus, because the Employment Discrimination lawsuit showing bipolar disorder as an illness of Hoeller in *Hoeller v. Eaton Corp., 149 F. 3d 621 (7th Cir 1998)* appears readily on the internet and outside the Pacer System, it has to be assumed to be known to Carroll at that time. She would have had a duty to examine on-line information as Carroll's Risk Manager when she said that "he [Hoeller} could apply using the standard process". It did not bother her about Hoeller's teaching performance in the Spring 2018, but when it was difficult for him to get a reply to both the jobs that he applied in the Spring 2018 on the pretest that his [Hoeller's] conduct was harassing, then she claimed that Hoeller had been terminated the prior year on April 15, 2017 to the City of Waukesha Police. This is to say that one day Hoeller's teaching was fine, and the next it was not. She is not going to be trusted as a witness, nor as a respondent in the Equal Rights Division. Hence, there is a Motion to Strike what she has written as anything similar to what has already been presented, and presented past statutory time-frames is harassing especially without names of complaining parties. Hoeller's prosecution is now based on pretexts and gross insufficiencies of Carroll's position statement. Advisors to Carroll have to protect the Board of Director's rights given that they have dismissal duties as shown below in the "Arugment' Section for non-stock corporations.

**ARGUMENT -- PART I: <u>Insurance Industry Improprieties</u>:**

The material facts to this litigation about negligence to the federal government indirectly by improprieties taken in the Insurance Industry for insurance underpayment, failure to cognize a need for coverage in good communications, and failure to mitigate potential damages are as follows. Each of these is numbered below for purposes of convenience, since a separate response to each may be required of this Court. In Wisconsin's Department of Financial Institutions, Carroll University is listed as a Non-Stock Corporation subject to **Wisc. Ch. 181 <u>Non-Stock Corporations</u>.**

*1.* **<u>CHARGE NO. 01 - Board Member Liability (Private Institutions):</u>**

**A.** **Board Member and Chair, Attorney Mr. Jose, Oliviero Leaves Board with Suspected Omissions**

The President's Fall Remarks on August 31, 2016 identify Mr. Jose Oliviero as the new Board of Trustees Chair at Defendant Carroll. (Refer to Exhibit "E" for the evidence). Mr. Jose Oliviero is also found as an attorney at the law firm of Michael Best & Friedrich LLP. It is alleged that as a result of tendering of the summons in *Milwaukee's federal Case No. 19 C 850*, Mr. Jose Oliviero abdicated his position in one way or another on the Board of Trustees.

The issue observed at that time [i.e. the filing of Milwaukee's federal *Case No. 18 C 850*] was that the law firm of Michael Best & Friedrich began earning income in representation contracts to Defendant Carroll. Conflict of interest policies and surety-type of insurance coverage is necessary in these cases in which it cannot be presumed that Carroll had errors and omissions insurance for board members under a comprehensive general liability policy, and that the coverage they may have had may not have handled different circumstances appropriately. This is

- 22 -

a general statement of <u>Charge No. 01's</u> obligations of mandatory indemnification.

For federal court precedence, refer to *Jarvis Christian College v. National Union Fire Insurance Co. 197 F.3d 742 (5th Cir. 1999)*. In *Jarvis Christian College* versus their insurance provider *National Union Fire Insurance Co.* an errors and omissions policy did not provide this Texas College coverage for losses caused by a board member's misrepresentations. The reason is that there was an exclusion that if the claim arises out of personal profit or advantage, then the insurer does not have to pay out. In this case, Mr. Oliviero's law firm gained the personal profit of the representation contracts. Hoeller has sent a summons to the directors of Michael Best & Friedrich for which they have not responded. That summons would help to determine the contractual obligations between the law firm Michael Best & Friedrich and Carroll, including lawyer Ms. Denise Greathouse's role to Michael Best & Friedrich's directors. For this reason and the precedence of the 5th Circuit, unless someone on the defense and defense representation's side answers that my claims of Mr. Oliviero's suspicious leave – that they have <u>not</u> risen out of mistakes of the Board of Director's knowing about *Cheryle Carlson v. Carroll University f/k/na Carroll College, Eastern District, Wisconsin, Case No. 09 C 551,* then this <u>Charge No. 01</u> is a *prima fascia* cause of action of insurance underpayments or non-coverage if Carroll has no insurance for the board and the board breached statutory obligations going back to the *Carlson* case, which is now under investigation with this litigation. One of the most recent letters of Defense Lawyer, Ms. Denise Greathouse is that she is representing Carroll and Jorgens in state court. Thus, she has not stated that she is representing Carroll's Board of Directors. So, whoever and however the *Carlson* case got dismissed, if it involved

- 23 -

the law firm of Michael Best & Friedrich, then it can be assumed that the lawyer was not acting on behalf of the Board of Directors similar to these cases. The board can ratify dismissal or apparently assign a smaller subgroup to examine the dismissal. In any event, that paperwork is necessary as a part of this litigation to collaborate the strategy for reasonable accommodations in disability discrimination lawsuits.

Applicable State of Wisconsin laws under **Wisc. Stat. 181.0872 Mandatory Indemnification** govern general considerations and exemptions to non-stock corporations for insurance coverage. By Mr. Oliviero's actions to leave the board, he may have been avoiding a court-imposed order against him under **Wisc. Stat. 181.0872 Removal of Directors by Judicial Proceeding** if he is found to have acted in a director role to Carroll with acts or omissions of his duties. **Wisc. Stat. 181.0807 Resignation of Directors** and **Wisc. Stat. 181.0808 Removal of Directors Elected by Members or Directors** govern processes, so that Carroll must have required documentation to be in legal compliance tracking what happened to his Board of Trustees' Chair position, and what happened associated with the dismissal of *Cheryle Carlson v. Carroll University f/k/na Carroll College, Eastern District, Wisconsin, Case No. 09 C 551.*

In general, a Restatement of Charge No. 01(A) is that Board of Trustees Member and Chair, Mr. Jose Oliviero, attorney of Michael Best & Friedrich, had a personal interest to leave the board by saving face or being sanctioned for interest conflicts either express or implied when litigation of Milwaukee's federal courthouse *Case 19 No. C 850* surfaced, because he was aware of acts and

- 24 -

omissions that he made while on the board, the board itself, and Carroll as a business entity to from federal case, *Cheryle Carlson v. Carroll University f/k/na Carroll College, Eastern District, Wisconsin, Case No. 09 C 551*. Those obligations upon dismissal according to **Wisc. Stat. 181.0744 Derivative Proceedings, Dismissal** states: "acting in good faith after conducting a reasonable inquiry upon which its [the boards] conclusions are based, that maintenance of the derivative proceeding is not in the best interests of the corporation". Hoeller contends that it was <u>not</u> in the best of interests of the corporation to lose at <u>Summary Judgment</u> or allow continuation of that lawsuit, because their insurance providers were overburdened by the costs of that litigation. This is Hoeller's dismissal theory of this cause – the case of *Carlson* drained Carroll's insurance providers, the Board of Trustees took no action in regards to its dismissal, and the business entity and the Board of Trustees made no corrective actions that Plaintiff Hoeller is aware of from his teaching in the Spring 2017. And, if Carroll's Board of Trustees made their responsibilities proper under non-stock corporation laws, then policies would have been set-up timely and training about Ethos of Respect statements as it affects student-to-student conversations.

    <u>Summary Charge No. 01(A):</u> Mr. Jose, Oliviero left his Chair position on the Board of Trustees as a result of the Employment Law litigation filed by Plaintiff Hoeller to prevent his removal, save face, and hide past acts and omissions of Carroll in regards to establishing education and advisement to students in a Dean of Students office about student questions about fellow student respect (i.e. what is described as peer-to-peer harassment in *Carlson*). All of this has cost their insurance providers the defense of another set of lawsuits in state and federal court

- 25 -

by Adjunct Faculty member, Hoeller and his business DQR Services; thereby, wasting federal benefits that could have been used better taking pro-active measures.

**B.** **Plaintiff's Free Speech Rights of a 'Fax' Reached Board of Directors Setting up Liability for Foreseeability**

A <u>Fax Communication</u> that Plaintiff Hoeller transmitted after business hours to Carroll's Human Resources ("HR") office on February 23, 2018 was protected by the First Amendment for Free Speech Rights and about the following subject: "dealing with the disengaging of individuals ... students.... regarded as having a mental illness". As part of an effort to have the last word after General Counsel, Ms. Catherine Jorgens sent a letter dated February 20, 2018 stating that Hoeller would no longer be working for Carroll in any position with or without an accommodation, the Fax Communication apparently made it to the Board of Trustees because some of the fax was published in news reports, and it would not be faithful of the Board of Trustees to ignore such a news release. This is especially true, because the business entity of Carroll filed *Civil Harassment Restraining Order, Waukesha County Case No. 18 CV 376* and the Board of Trustees would have had to establish a project to monitor this under non-stock corporation statutes for litigation which is considered derivative proceedings.

Therefore, it is reasonably foreseeable to the Board of Trustees that if there were breaches of legal duties for which this concerns fiduciary in insurances, Hoeller had shown in that <u>Fax Communication</u> that he would act on behalf of the federal government. Note that the <u>Fax Communication</u>, which is not re-printed here for confidentiality purposes, was sent to the U.S. Department of Education with markings "waste fraud and abuse".

Prior to the filing of this litigation, Hoeller gave the opposing lawyer's office of Michael Best & Friedrich LLP five (5) business days to make a settlement offer and no reply has been received as of the date and time of the filing of this lawsuit. By the non-response, the opposing party continues to believe what was found in state court *Case No. 19 CV 995* that Hoeller does not make sense as reported in Chicago's federal district court that Hoeller misses substantially causes of action of fails to state claims. However, Hoeller has excellent staying power to continue to try to succeed through litigation like this.

Thus, in summary for <u>Charge No. 01(B)</u> this litigation against Carroll on grounds of a *qui tam* action is foreseeable as waste, fraud, and abuse and cannot be dismissed on a defense cause of surprise or non-foreseeability.

2. **<u>CHARGE NO. 02 – Professional Malpractice Liability (Civil Litigation Filed by a Non-Stock, Wisconsin Corporation):</u>**

A. **Carroll University, Principal and Michael Best & Friedrich LLP, Agent with Board Rules of Non-Stock Companies Applying for Obligations**

Carroll University filed *Civil Harassment Restraining Order, Waukesha County Case No. 18 CV 376* when *Disorderly Conduct Charge, Waukesha County Case No. 18 CM 491* was filed by the State of Wisconsin against Plaintiff Hoeller on or around February 26, 2018. It was argued unsuccessfully by Hoeller before Wisconsin's Court of Appeals in *Case No. 21 AP 1251, Hoeller v. Circuit Clerk of Waukesha County* courthouse based on *Waukesha County Case No. 21 SC 921, Hoeller v. Circuit Clerk of Waukesha County* courthouse that Carroll University, through its lawyers of Michael Best & Friedrich LLP as agents under theories of <u>Restatement of Agents in Contracts Law</u> filed an unnecessary lawsuit adding undo stress to Hoeller driving him mentally ill, incurring behavioral health costs, and

releasing impermissibly personal, private, and confidential information in violation of fair dealings and equitable principles associated with Wisconsin's Trade Secrets Act. Hoeller has found intellectual law firms that want to charge $1,250 per hour to examine all of the evidence in these cases to observe the trade secret dispute in regards to equitable relief. Relief for injured reputations like Hoeller's can involve a civil court trial in Waukesha Circuit Court with Carroll paying for Hoeller's attorney fees in order to develop the level of wrongdoing towards a Consent Decree. Hoeller has won a briefing schedule to seal the documents of *Case No. 18 CM 491*. It has been more than 90 days since the sealing of those documents and neither the business entity, nor Carroll's Board of Trustees has confirmed that this action is over, and whether they are willing to award Hoeller costs as the <u>Prevailing Party</u>. This may be necessary under the Rehabilitation Act of 1973, since Carroll's lawyer, Ms. Jorgens has used a letter to prevent Hoeller from working any role at Carroll.

To show the circumstances that Hoeller wrote in the Wisconsin's Court of Appeal's Brief in *Case No. 21 AP 1251, Hoeller v. Circuit Clerk of Waukesha County* that Carroll and its Board of Trustees can address as an intervening cause, if desired, using counterclaims against the Circuit Clerk, a true and accurate copy is printed below between the dashed lines for reference. Item "C", came from a 'Statement of the Case" Section.

-------------------------------------------------------------------------------------

## C. <u>Circuit Clerk of Court Failed to Exercise Good Judgment Under Its Goals</u>

A goal of the Circuit Clerk of Court is a reduced workload by fewer cases by hearing-time, but the Circuit Clerk of Court failed to protect Hoeller's rights allowing an

unnecessary lawsuit to be filed by Carroll. The Wisconsin Equal Rights Division would say that this lawsuit was a retaliatory injunction. The case was unnecessary, because it acted as a restraining order so that Hoeller did not enter the property owned by Carroll. But he was involved and charged with *Disorderly Conduct Case No. 18 CM 491* as a result of the Complainant and those directions of a Court Commissioner to avoid the Complainant Carroll University was inherent in that cause. All lawyers would know this.

Ms. Greathouse was Carroll's lawyer in that matter. She filed an unnecessary lawsuit against Hoeller in which Hoeller could not appear after filing several petitions prior to the appeal... .

---------------------------------------------------------------------------------------------------

As above, the obligations according to **Wisc. Stat. 181.0744 Derivative Proceedings, Dismissal** state: "acting in good faith after conducting a reasonable inquiry upon which its [the boards] conclusions are based, that maintenance of the derivative proceeding is not in the best interests of the corporation". Hoeller has no indication that from the filing of *Civil Case No. 18 CV 376, Carroll v. Hoeller* on February 26, 2018 that the Board of Trustees wanted the filing of that case and the motion to withdraw without prejudice filed by Ms. Denise Greathouse in early September 2018 more than 90 days after the filing of that lawsuit. It is the case that all lawyers, have to know the laws that apply to the business entities whom they are representing. In this case **Wisc. Stat. 181.0742 Derivative Proceedings, Demand (1) Demand** and **(2) 90 Day Obligation** makes it clear when the non-stock business entity such as Carroll is involved in litigation, then there has to be a letter requesting the same and the institution is required to wait 90 days. Certainly, 90

- 29 -

days had not occurred from any prior applicable date before the litigation had been commences. In addition, Carroll had not described in that lawsuit that an "irreparable injury would have occurred to them" in the event that they had to wait the 90 days.

Thus, without the lawyers showing actions taken by Carroll and Board of Trustees relative to the filing of *Civil Case No. 18 CV 376*, the request to dismiss it without prejudice asked by Ms. Denise Greathouse, and the subsequent pleadings in which Hoeller won the sealing of those documents – that the lawyer's themselves have neglected their duties to make it clear who they are representing and what the decisions are and have been in regards to **Wisc. Stat. 181.0744 Derivative Proceedings, Dismissal.** It is in the best of interests of the lawyers to obtain the Board of Trustees agreement or not about whether or not Hoeller is the Prevailing Party and *Case No. 18 CV 376* is over. This case was filed more than three (3) year's ago, and it is harassing that none of Plaintiff Hoeller's correspondence to the Wisconsin Equal Rights Division nor through Carroll's lawyers have gotten a response about the Prevailing Party and awarding Hoeller his costs, which include business income from a billing statement. Again, Carroll's insurance providers have been overburdened by the costs of that litigation, so answers about whether or not *Case No. 18 CV 376* is closed by the Board of Trustees is needed. This is under the theory of a breach of contract by Ms. Denise Greathouse and the law firm of Michael Best & Friedrich LLP in regards to having taken liberties by not responding to a state court summons served through a private process server to the directors of Michael Best & Friedrich LLP to ascertain the applicable terms and conditions of the Carroll representation contract.

**B.** **General Counsel, Jorgens and Agent Attorney Ms. Denise Greathouse, Michael Best & Friedrich, LLP for Federal Law Violations of Intimidation**

Ms. Catherine Jorgens, JD, General Counsel of Carroll University and Ms. Denise Greathouse, Michael Best & Friedrich, who are defending Carroll's position in all of the lawsuits in state and federal courts have gotten involved in a stressful and potentially dangerous scheme of dispatching law enforcement officers from another jurisdiction to deal with what they believe is harassment by Hoeller in regards to tendering communications. There have been three times in which Detective Stucker has come over to Hoeller's property, including the first on February 23, 2018, notifying that he was harassing personnel at Carroll University. In the first one, he asked to have not communications, but left a letter that was lost to the City of Milwaukee Police that had some other warning. Detective Stucker has written two (2) police reports. He has observed the stress that this has caused Hoeller and his immediate family members of his parents who attended two (2) of the three meeting events.

The responsible parties for this are Ms. Catherine Jorgens, JD, and Ms. Denise Greathouse under a common law charge of a negligence for failing to speak truthfully to police officers under rules of the Office of the Lawyer Regulation. This complaint has already been written in briefings of Milwaukee's federal courthouse, *Case No. 19 C 850* on July 16, 2020 as follows in which a true and accurate copy is shown between the lines.

---------------------------------------------------------------------------------------------------------

Witness Intimidation, 18 U.S. Code § 1512. Tampering with a witness, victim, or an informant by influence, delay, or prevention of the testimony of any person in an official proceeding when the police's Detective Stucker responded to Hoeller's home threatening a charge of

harassment if paperwork to Carroll's' employees of legal pleadings from court did not stop. This has been meant to influence the outcome of state court and cause abuse to Hoeller who has to be cautious as he is on probation.

One other comment is that this does not clear all of the parties for a fundamental flaw in the prosecution of *Waukesha County Disorderly Conduct Charge Case No. 18 CM 491*. That fundamental flaw is that the prosecution was initiated by a complaint of harassment in a constructive discharge of employment by a demotion, slander, and defamation.

-------------------------------------------------------------------------------------------------

To date, no reply to this charge has been received. It is best that this charge become a charge against Carroll if Carroll's lawyers are released for negligence and tortious conduct. A difficulty for Ms. Jorgens is that she is a volunteer member of the City of Waukesha's Fire & Police Commission, and she appears to have a will to screw around with people like Hoeller.

In general, a <u>Restatement of Charge No. 01</u> is that the Defendants have an understanding with the police and have worked a plan to establish wrongly that Hoeller could not work any longer at Carroll due to harassment, and to do this they have gone to the extent of a deprivation of rights that is covered under a 42 U.S.C. Section 1983 petition against the police that can hold a private actor responsible for a willful participant with the police breaching Hoeller's rights. This is based on a U.S. Supreme Court case that is cited by the Center for Education and Employment Law, 18th Edition, pp. 153-4 (2017) in "The Eight Circuit Court of Appeals affirmed a Minneapolis judge's decision to dismiss a fired law professor's speech rights". Refer to *Magee v. Trustees of Hamline Univ., 747 F.3d 532 (8th Cir. 2014).*

- 32 -

The error in the filing of this lawsuit is that the fired professor *Magee* could not show how the school and dean had an understanding with the police defendants that they were working together to get *Magee* put out of work. Again this case is different, Ms. Jorgens is a member of the Fire & Police Commission and made inflammatory statements to the police that cannot be true in regards to Hoeller's arrest for *Disorderly Conduct in Waukesha County Case No. 18 CM 491*, and than intimidated him so he could not testify against them in *Civil Harassment Restraining Order Case No. 18 CV 376*. In other words, a separate lawsuit from this one could be that Carroll's General Counsel working on the Fire & Police Commission in a cause to screw around with people including the police themselves made inflammatory statements resulting in a wrongful arrest and incarceration causing damages to Hoeller that could possibly be a Carroll Workers Compensation insurance cause collecting damages of about $80,000 to Milwaukee County and $10,000 to Waukesha County as interested third parties. This mental health stress case resulting during Hoeller's re-application to teach a same and different class using the "standard process" in the Spring of 2018 has just been noticed to Carroll through Waukesha Small Claims *Case No. 21 SC 1653, Hoeller v. Jorgens*. In summary, games that some staff play against other staff members and faculty in educational settings is an insurance waste constituting an intentional tort of an employee. In this case the employees are lawyers, so Carroll's Professional Malpractice insurance is what is at issue.

- 33 –

3. **CHARGE NO. 03 – Constitutional and Due Process Deprivation Liability (Private and Public Institutions):**

A. **Rights of Free Speech to Protest without Retaliation by Coordinated Effort of General Counsel and Police Setting-up a 42 U.S.C. Section Petition**

As noted immediately above, the combination of slanderous and unbelievable statements by Jorgens to the police with the police scared of defying her since she works on the Fire and Police Commission in a superior, supervisory role; the police and university through her executive positon worked a plan to have Hoeller taken away from his security of his home and papers (i.e. a 4th Amendment Rights petition) for exercising his Free Speech Rights when Carroll's employee failed to get back to Hoeller for his applications in the Spring 2018 and were inconsistent. That failure to get back to Hoeller about his application for teaching Physics II lecture is called the "standard process" by Jorgens in a letter associated with his application and not as means for disparate treatment to other part-time and full-time members exempt of a regular faculty member that the university hired to teach those classes for which Hoeller was qualified to teach with or without a reasonable accommodation. Note that the letter makes no statements about the "standard process" being a way to screen Hoeller out of work. It could also be due to her failing to take serious the internal charge of harassment premised on civil rights violations in the letter Hoeller's sent to the Provosts' office dated around January 23, 2018. Causation is certainly close as the last thing on her mind when she received an investigational letter of the Supplier Quality & Failure Analysis Center$^{TM}$ under *Lugg v. Sutton, Dist. Court, CD Illinois 2021* as described above in the <u>Process History</u> Section is that letter of Hoeller sent via Certified Mail to the Provost's office seeking justice for the harassment.

**B.**   **Hoeller Had Reasonable Expectation of Continued Employment and Carroll Used Student Course Evaluation Past Statutory Time-Frames**

As mentioned above, a letter that is not enclosed here by General Counsel, Ms. Catherine Jorgens states to Hoeller and his supervisory hiring staff that for the Spring 2018, Mr. Hoeller could follow the standard process. Because this letter was written after Hoeller had obtained a copy of his <u>Personnel File</u> and found no adverse issues that would have prevented his continued employment during the Spring 2018 term, and Hoeller had provided a letter to Ms. Jorgens around December 12, 2017 that requested her to report if there were any issues and there were not any issues, Hoeller had a reasonable expectation of continued employment. He did not have to state a reason associated with the Americans with Disability Act or the Rehabilitation Act in his continued employment as a property right of his. Thus, when his application for teaching Physics II lecture was not responded to, Hoeller knew that he was being treated worse than other two (2) other cases against academic, teaching institutions. Those cases are reported here from the Center for Education and Employment Law, 18th Edition, p. 235-4 (2017) in "The Supreme Court of Nevada was liable to a tenured professor for breach of contract because it discharged him based on outdated evaluations". Refer to *State of Nevada Univ. and Community System v. Sutton 103 P.3d 8 (Nev. 2004)*. Also, refer to the same book reference of the 18th Edition (2017), p. 237,, "A Kentucky university police officer whose contract was not renewed could not sue for due process violations". Refer to the reasons and expectations of a federal district court when he could sue for due process violations in *Baker v. Kentucky State Univ., 45 Fed. Appx. 328 (6th Cir, 2002)*.

- 35 –

(1) The Nevada Supreme Court case of *Sutton* makes it known that under a breach of contract theory for due process violations from employment agreements, the university gave the professor two consecutive unsatisfactory evaluations. After hearings and offers to him for a non-tenured position, he sued the university. Eventually, a settlement agreement was secured. But, the court ordered to continue his employment unless the school revoked his tenure. Another lawsuit followed in which the professor claimed the university had breached the settlement agreement. By this time, the performance evaluations by the university were old as much as six (6) years and the Nevada Supreme Court concluded that the university breached the settlement by holding hearings based on an outdated complaint including the prior evaluations. In Hoeller's case, he did not have the rights to obtain consecutive evaluations from Carroll University. They never gave him one from the Spring 2018. In addition, Carroll is using a student course evaluation past the statutory time-frame of injuries to persons of three (3) years which is harassing. The comments (free-writing) section by the students is also being misused, since Ms. Jorgens who is reporting this information from Electronically Stored Information ("ESI") under Wisconsin's Supreme Court rules concerning usage had declared that these are complaints. The university has no standing to assert this on behalf of the students after three (3) years like *State of Nevada Univ. and Community System* which exceeded statutory time-frames in Nevada.

(2)    In Kentucky, a police officer was hired on an annual contract which is not much different than Hoeller who had annual renewals of this teaching contract to teach the same courses in the Physics Department. Then, when there was evidence of poor work performance for an officer which were called "dubious

- 36 –

arrests of several students", he was suspended. In this regards, Hoeller was never suspended, but treated differently to another institution where he taught which was College of Lake County, Illinois. After the officer filed a federal lawsuit, the most important factor for the university obtaining dismissal of due process violations, the office could not show that he had a legitimate expectation of continued employment with the university. Thus, this one factor became so important that Hoeller does have a right to continue his employment by the letter of Ms. Jorgens mentioned about that stated that Hoeller could apply in the Spring 2018 using the standard process. Therefore, Hoeller's due process rights have been violated. A letter of the Human Resources Department officially notifying him that they would rather not want to hire him but not giving a reason dated January 15, 2021. Charge No. 3(B) is the substance of the current litigation of *Hoeller v. Jorgens, Case No. 21 SC 1653* filed in Waukesha County Small Claims court. This case is under appeal for dismissal lacking proper venue in which the charges against Carroll revert back to *Civil Case No. 18 CV 995* for a large-scale claims action with the substance concerning lawyer's malfeasances so Wisconsin's Supreme Court might be the only court of suitable jurisdiction to review *Case No. 21 SC 1653.*

4. **CHARGE NO. 04 – Employee Liability of Publicity (Private Institutions):**

Spokesperson, Ms. Jeannine Sherman, Director of Communications and Marketing for Carroll University is quoted by NBC-4 News - Milwaukee as having said: "We had to remove him [Hoeller] due to students concerns about his teaching". Since she is not at a VP level or executive board member, the requirements of Carroll's insurance is that it must cover errors and ommissions. So that this is not false reported information, Ms. Catherine

Jorgens is following up in her <u>Position Statement</u> to assert this, when in fact, they do not have standing in court through the theory of interference by a third party in a pending contract under <u>Restatements (Second) of Contracts for Torts</u>. The third-party would have to appear. The third-party would have to be named, too.

5. **<u>CHARGE NO. 05 – Employee Liability of Personnel Records and Charging Party's Privacy (Private Institutions):</u>**

When Hoeller sought a consultation with an Employment Lawyer on May 2, 2017, the lawyer advised him to get his employment file. When this was done via certified mail return receipt, Carroll delayed past a statutory time-frame required for a reply making Hoeller write another letter to the Provost's office. Finally, more than 20 days after the date of receipt of Hoeller's original letter requesting a copy of his Personnel File, Hoeller received it through the office of Ms. Catherine Jorgens, Legal Staff. She also acted in an employee role at Carroll as the Risk Manager. Such delays past statutory time-frames is a good cause for errors and omissions insurance involving employees.

**ARGUMENT -- PART II: <u>Inappropriate Unpaid Wages</u>:**

**<u>CHARGE NO. 06 – Employer Responsible for Payments To Meet Minimum Standards in any Week:</u>**

Hoeller's wage claim stems from work of his and all other Adjunct Faculty class members from an informational – training session at Carroll's campus on January 19, 2017. The meeting was held during a week when pay was $0 for that week. That week was not covered by the dates of anyone's employment contracts (Refer to Exhibit "F" for an example of a contract with dates that start on the first day of the specific class meeting).

Pay for a 2-hour long meeting was not provided. In Hoeller's records, the informational – training session lasted from 5 P.M. to 7:45 P.M. Cumulative missed pay going back to a change in law on December 1, 2016 is about $110,000. This law was noted in the President's President's "Opening Remarks" made on August 31, 2016 (Refer to Exhibit "G").

### CHARGE NO. 07 – Employer Responsible for Payments To Meet Professional's Standards of Pay for any Week:

As mentioned in the Background Section, teaching in higher education requires both teaching and professional duties. To upgrade Carroll's pay-rate to be more mainstream with a public 2-year college from *Filipek v. Oakton Community College,* there can be additional activities that can be paid on an hourly rate, in which the hourly rate would not be less than $17.10 which is a professional's hourly rate in an entry level position with an associate's degree. Because Carroll required one (1) hour per week for office hours, and Hoeller made a fair estimation that his hourly rate was below $17.10, then everyone's salary should be increased to account for this one (1) hour per week office hour, about a 1/15th or 1/16th increase over the contracted salary. In addition, if the faculty member attended any meetings, then the meetings should be compensated. This might be the same amount of $110,000 cumulative for the class going back to December 1, 2016 for all of about 256 adjuncts. Additional pay would be required for substitute work.

### CHARGE NO. 08 – Employer Responsible for Not Changing Terms and Conditions During Semester Or Make Suitable Pay:

As mentioned above, Hoeller attended a faculty meeting which was not required. He and all other faculty members should be compensated with additional pay as a meeting,

because if it were not but-for the fact that Hoeller had come to these meetings, he would not have been able to protect his rights asserting negligence, breach of contract, and inappropriate, tortious conduct against the business entity of Carroll from his employment and failed continuation of that employment by employees and executives of Carroll. All meetings need to be paid at a rate of a Professional Employee rate as these are behind the scene duties not necessarily those of a teacher. Again, if all of the adjuncts attended one meeting each semester, this would amount to another estimated required pay of $110,000.

**CHARGE NO. 08 – Employer May Adjust Base Pay by 30%:**

As determined above, if all contracts are increased by 30% to make up pay for every category of job duty, then this would put Carroll in-line with mainstream colleges. There was concern in the President's "Opening Remarks" made on August 31, 2016 that pay could be made competitive. (Refer to Exhibit "H).

**ARGUMENT -- PART II: Timeliness of Wage Claim Not Late:**

Per instructions and a form provided of the Wisconsin Equal Rights Division on August 2, 2021, Hoeller filed a notice via Certified Mail Return Receipt of his Wage Loss. Within one (1) month in a letter dated August 31, 2021, the Wage Loss went through the initial review process to the Director, Mr. Matthew White. In Exhibit "I" is a true and accurate copy of the denial decision. On an August 27, 2021, a letter that was sent for a review to the U.S. Department of Labor copying the lawyer of Carroll University, Ms. Denise Greathouse and the State of Wisconsin Department of Justice. Refer to Exhibit "J" for a copy of that letter.

The issue is one of Equal Protection, because on January 19, 2017 another adjunct

- 40 -

asked for one additional week of pay and apparently got it. In addition, referring to Exhibit "H" of the President's "Opening Remarks" made on August 31, 2016 that pay could be made competitive, this sets-up an implied contract of six (6) years for development. Furthermore, Hoeller never received an academic decision regarding one of his applications for the Spring 2018 term. It was not until those positions were needed to be filled again that Hoeller re-applied and was not hired. But, this time the HR Department in whose name is unknown provided a letter dated January 15, 2020 to deny Hoeller's continuation of employment going back to his application for the Spring 2018 term. Thus, the filing of this pending continuation of contract for wage losses occurred in a denial on January 15, 2020 which has extended the deadline to be within two (2) years of the denial dated August 31, 2021 of the Wisconsin Equal Rights Division. A true and accurate copy of the letter dated January 15, 2020 of Carroll's HR Department is found in Exhibit "K". It is based on the standard letter used dated April 25, 2017 (refer to Exhibit "L") to announce the coming end of a contract so that arrangement can be made to remove property over the summer months.

In any event, the Wage Claim is timely for the reasons above. Another theory is found in the ERD's letter August 31. 20212 that makes it suspicious as an inference of insurance fraud that Hoeller's contracts were never brought to the attention of any jurisdiction regarding Employment Matters. For this reason, the insurance claims have been filed in this lawsuit.

As another explanation, it was explained on P. 34 of this brief that "Carroll's employee failed to get back to Hoeller for his applications in the Spring 2018 and were inconsistent". Here "employee" means the educational course assignment side of Carroll's business operations. This would be Hoeller's immediate supervisors defaulting up-the-

- 41 -

ladder to the Provost's office which would make final hiring decisions in case of impasse or dispute with the specific personnel of the educational area. In the absence of this process of assigning classes, then a letter of the HR Department would suffice to clarify whether an individual was teaching or not in that semester. Unfortunately, this theory (and others) were availing to the Wisconsin Equal Rights Director, Mr.

## SUMMARY

Following dismissal of Milwaukee's federal courthouse *Case No. 19 C 850, Hoeller v. Carroll University* that was described as unexhausted, iteration of EEOC originated charges originating on September 17, 2018 in the Wisconsin Equal Rights Division ("ERD") has occurred -- for which the ERD has been charged collaterally for impermissible delays in *Milwaukee County Case No. 21 SC 1518* for failing to pursue the process immediately given public exposure of lost reputation to Hoeller. The case of discrimination by disability has narrowed to pretexts and intentional motives. There are some other motives (religion, retaliation, engaging in political activities, and civil rights) that can be raised to provide reasonable doubt based on the EEOC file in order to show that the reason proffered is not the actual reason for failure to continue employment after some expectation of continued employment.

In regards to retaliation that is under examination late in a March 23, 2021 dismissal of the ERD's investigational staff, when an internal charge of harassment was alleged in Hoeller's January 23, 2018 letter to the Provost office – this motive for failure to re-hire is best examined under the most recent case in the Central District of Illinois's federal court of *Lugg.* It will take timing and rare evidence, as that court mentions, for federal court to examine a retaliation charge. Then, for protected expression to be the

- 42 -

source of retaliation by the employer, they would have had to have known of the conduct. In Hoeller's cause, both the business entity Carroll and the Board of Trustees through Wisconsin Statutes concerning derivative proceedings knew of the Temporary Restraining Order ("TRO") filed in *Case No. 18 CV 376* against Hoeller on February 26, 2018. Therefore, he has clear evidence that the operating divisions of the Defendant were knowledgable of the Public Safety Director's letter and Hoeller's attempts in Waukesha County to put in counterclaims to the TRO-cause, even filing litigation against the Circuit Clerk of Court of Waukesha that is removable to federal court after dismissal favoring the Circuit Clerk of Court. This raises another issue, because the Circuit Clerk of Court of Waukesha works for Milwaukee's federal court. In federal court, the case is best served moved to Madison's federal courthouse once a pre-trial hearing has been established. In Hoeller's constitutional rights, he cannot be treated worse than *Gouge*.

Plaintiff Hoeller agrees that cases of retaliation as the motive are rare, because only one cause for employment retaliation that the Plaintiff is aware from a textbook that he owned before this litigation was appealed and upheld on behalf of the employee to the Supreme Court of Rhode Island. This case is *Adams v. Uno Restaurants, Inc. 18 IER Cases 998 (2002)*. Once the police got involved in a shouting match between *Adams* and a supervisor with someone calling the police on a vague statement construed as a threat a disorderly conduct charge was filed. The only reason for his release in employment was retaliation in that the badgering of *Adams* was meant to provoke a reaction. The Defendant *Uno Restaurants* could not speak about the charge of disorderly conduct against *Adams*, because the case was sealed administratively after one (1) year. This occurred, apparently, when the Board of Directors of *Uno Restaurants* failed to act to ratify their interest in the prosecution of the disorderly conduct charge. This delay could be understood by a

- 43 -

reasonable person in jury, since the same thing has happened with TRO-*Case No. 18 CV 376*. After sufficient time, that is about 90 days from the date of filing on February 26, 2018, Hoeller sealed the TRO-*Case No. 18 CV 376,* so it is moot. Carroll cannot allege that Hoeller was charged with harassment. They are down to their only explanation which is third-party evidence of a student course evaluation. It was collected outside Hoeller's <u>Personnel File</u> in Electronically Stored Information (ESI). It cannot relate back to performance issues, since there are too many factors. Usually courts have left this to the busines entities.

As far as the *Disorderly Conduct Case No. 18 CM 491* against Hoeller, it could be mentioned by the Defendants but it would be prejudicial. It also relates back to *Carlson*. There will be trade-offs. Hoeller has the Fax Communication as his Rights to Free Speech if the disorderly conduct charge is admitted for trial. This is all unresolved. Federal court has not assisted in any resolution of this either from *Case No. 19 C 850* with case that they like to rely upon.

Hoeller is suing Ms. Jorgens in Waukesha County to strike her <u>Position Statement</u> that has given rise to the March 23, 2021 ERD determination and preliminary order as they do not have standing on behalf of any third-party past three (3) years, this includes the students under the theory of tortious interference of a pending contract. A reasonable juror could understand that Hoeller has not been re-hired to continue his employment, because they are making student complaints out of his student course evaluation, and attempting to protect their insurance providers when Hoeller has raised his voice with a calwoul to the Secretary of the Provost's office under the pretext that Hoeller is dangerous.

The problem that the judges clearly have in Waukesha County dismissing Hoeller's actions on one brief is that they fail to consider the "what if" the Plaintiff's are coming into

court Pro-Se and own textbooks on the area of law that they are prosecuting in court like the Employment Law Textbook that Hoeller owns. Unfortunately, the judges would never know all of the specifics that a Pro-Se litigant would know if he [Pro-Se litigant] owns legal textbooks used in university studies. This is an error in the thinking of the judges of the background, education, and experience of the Pro-Se filiers in Waukesha's Circuit Courthouse.

In the event that Carroll's <u>Position Statement</u> remains in place under the theory of poor performance for an academic dismissal irrespective of Hoeller's interpersonal skills wihich are just hardly managed at the time of his contract in the Spring 2017 term, then Hoeller is reserving his rights upon appeal to assert any one or more of the following in response to such a disciplinary dismissal action that is noted in the 7th Circuit Court of Appeal cause of *Ross v. Creighton Univ., 957 F.2d 410 (7th Cir. 1992)* that 11 states reject educational malpractice. Those rights that Hoeller reserves upon appeal are the following: (1) there are no readily acceptable standard of care for teaching, (2) there is no causal relationship to a student's objectives, (3) there is no injury to Hoellers' students, (4) public policy considerations make such claims disfavored, (5) increased litigation occurs taking federal government money away under this *qui tam* act theory, and (6) judicial deferense usually is moot as they recognize that academic decisions are best for academia.

## RELIEF SOUGHT

It is within this Court's purvey to issue suitable injunctive relief if this breach of contract theory lawsuit has reduced Carroll, as an Interested Party in any probate cause, to have to wait to have decedent's estates settled. As mentioned above in the <u>Background Section</u>, the estate of Richard "Dick" L. Oates whose lawyer from Chicago is copies on

- 45 -

this brief is in a precarious situation in starting a new endowment. Hoeller has declared *in rem* jurisidiction over the bank accounts of Carroll in the *Court of Appeals Case No. 20 AP 227, Hoeller v. Carroll.* The Court of Appeals is behind in reviewing briefs submitted in this matter.

Injunctive relief can be made on the basis of the following below, for which this brief has presented a number of good causes in different charges numbered above to award Hoeller that relief. The moving party, which is Hoeller, can be provided a temporary injunction to provide an answer if the elements are met as follows:

1) the movant is likely to suffer irreparable harm if a temporary injunction is not issued;

2) the movant has no other adequate remedy at law;

3) a temporary injunction is necessary to preserve the status quo; and

4) the movant has a reasonable probability of success on the merits.

The answer is whether or not the Board of Trustees of Carroll University is aware that Civil Case No. 18 CV 376 has been sealed due to the non-response of the Board of Trustees to ratify continuation of that lawsuit. In addition, Board of Trustees should be questioned if they want a quick resolution to this matter as it may be interfering with causes like *Waukesha Case No. 21 PR 476*, of if they are going wait until the 5th to 6th anniversary of the December 1, 2016 change in federal laws. In addition, the Plaintiff would like any other relief that is suitable for this cause including certification as a Class Action matter. No further does this request.

_____

Timothy L. Hoeller, Pro-Se
dba DQR Services
SUPPLIER QUALITY & FAILURE ANALYSIS CENTER

**DISTRIBUTION:**

<u>Responsible Party for the Defendant</u>:
Ms. Catherine E. Jorgens
Carroll University, Registered Agent
100 N. East Avenue
Waukesha, WI 53186

<u>Review Copy to Waukesha Circuit Clerk of Court</u>:
On behalf of Judge Domina, Hoeller v. Carroll University, Case No. 19 CV 995 and
Hoeller v. Jorgens, Case No. 21 SC 1653
On behalf of Honorable Michael P. Maxwell, Case No. 21 PR 476, estate of Richard
"Dick" L. Oates as an Interested Party
Waukesha Circuit Clerk of Court, Ms. Monica Paz
515 W. Moreland Blvd.
Waukesha, WI 53188

<u>Review Copy to Waukesha Court of Appeals</u>:
On behalf of Hoeller v. Carroll University, Case No. 20 AP 227
On behalf of Hoeller v. Jorgens, appeal of Waukesha Case N0. 21 SC 1653
Sheila Reiff, Clerk of the Supreme Court and Court of Appeals
P.O. Box 1688
Madison, WI 53701-1688

<u>Complementary Courtesy Copy</u>:
Porvaznik, Paul B, attorney on behalf of the estate of Richard "Dick" L. Oates
Bielski Chapman, Ltd
123 N. Walker Drive
Chicago, Illinois 60606
Re: Waukesha County Case No. 21 PR 476

<u>Responsible Party for the Plaintiffs</u>:
Timothy L. Hoeller, M.S., Adjunct Faculty, Plaintiff Pro-Se
State Bar No.: N/A
Address: 8735 N. 72nd St., Unit 101, Milwaukee, WI 53223
Telephone No. 414-630-9740
Fax No.

<u>NOTICE OF FILING</u>

PLEASE TAKE NOTICE that the undersigned Plaintiff, Pro-Se Timothy L. Hoeller served this notice by hand-delivering the attached <u>Complaint</u> to the Clerk of Milwaukee's Federal Court, 517 E. Wisconsin Ave, Room 362, Milwaukee, WI 53202. Upon filing, copies were sent via U.S. Mail as above to each of the Responsible Party's noted above.

.

Dated this 3rd day of August 2021

By_____

Plaintiff, Pro-Se               Date

Timothy L. Hoeller, Pro-

Timothy L. Hoeller, M.S., Adjunct Faculty, Plaintiff Pro-Se
8735 N. 72nd St., Unit 101
Milwaukee, WI 53223

- 48 -